104 P.3d 1280 (2005)
KITSAP COUNTY, Respondent,
v.
MATTRESS OUTLET/KEVIN GOULD, Petitioners.
No. 73913-7.
Supreme Court of Washington, En Banc.
Argued February 19, 2004.
Decided January 27, 2005.
*1282 Talmadge & Stockmeyer, Philip Talmadge, Emmelyn Hart-Biberfeld, Tukwila, Cullen & Bernstein, Paul Cullen, Seattle, for petitioners.
Russell Hauge, Kitsap County Prosecutor, Philip Bacus, Deputy, Port Orchard, for respondent.
IRELAND, J.[*]
In this case we decide the constitutionality of Kitsap County's sign ordinance, which the county claims prohibits Mattress Outlet's use of raincoat-clad workers as offsite advertisements. We hold that Kitsap County's Code (KCC) 17.445.070(C), as applied to the Mattress Outlet raincoats, is an unconstitutional restriction of commercial speech. Therefore, we reverse the superior court and affirm the district court's dismissal of the citations issued to Mattress Outlet.

FACTS
Petitioner Mattress Outlet operates a retail mattress business in various locations throughout the state, including a store in Silverdale in Kitsap County. Kevin Gould is the director of operations and the general manager responsible for the Silverdale store. One of Mattress Outlet's advertising techniques is to pay independent contractors, who wear yellow, oversized raincoats that display Mattress Outlet's name, address, and telephone number, to stand on public sidewalks and wave to passersby. Mattress Outlet also sells these raincoats at its stores, along with hats, t-shirts, and other items advertising Mattress Outlet.
On October 24, 2001, a Kitsap County Code Enforcement Officer cited Mattress Outlet for using raincoat-clad workers as "an offsite sign without a permit" in violation of KCC 17.445.010 and 17.445.070(C). Clerk's Papers (CP) 49-52, 167.
The district court found the sign ordinances unconstitutionally vague and overbroad, as well as an unconstitutional restriction of free speech as applied to the raincoats used by Mattress Outlet. The district court dismissed the violations. The county appealed to the superior court, which reversed, ruling that the statute was not vague, that Mattress Outlet did not have standing to challenge the ordinance on overbreadth grounds, and that the commercial speech restrictions were constitutional as applied to Mattress Outlet. We granted Mattress Outlet's petition for review.

DISCUSSION

Standard of Review
Municipal ordinances are interpreted using the same rules as state statutes. *1283 City of Spokane v. Douglass, 115 Wash.2d 171, 177, 795 P.2d 693 (1990). The constitutionality of a statute or ordinance is an issue of law, which we review de novo. Ino Ino, Inc. v. City of Bellevue, 132 Wn.2d 103, 114, 937 P.2d 154; 943 P.2d 1358 (1997). A duly enacted ordinance is presumed constitutional, and the party challenging it must demonstrate that the ordinance is unconstitutional beyond a reasonable doubt. Douglass, 115 Wash.2d at 177, 795 P.2d 693.

Analysis
Mattress Outlet contends that under the plain language of the sign code, its raincoats are not signs and, therefore, are not subject to the sign ordinance. Kitsap County contends that the raincoats are signs, as described by the nonexclusive list of portable signs regulated by the sign ordinance.
The Kitsap County ordinance defines a "sign" as "a collection of letters, numbers or symbols which calls attention to a business, product, activity, person or service." KCC 17.110.675. A "portable sign" is defined as one "which has no permanent attachment to a building or the ground which include [s], but is not limited to, A-frame, pole attachment, banners and reader board signs." KCC 17.110.620.
The ordinance requires a permit to display a sign, unless the sign is exempt. KCC 17.445.010. Signs exempt from the regulations include traffic, street, and legal signs; "for sale" and "for rent" signs; official community festival signs; and certain signs placed by governmental agencies. KCC 17.445.080. Other signs are conditionally exempt from the sign code, and they include "help wanted" signs, restroom signs, political campaign signs, garage and yard sale signs, subdivision signs, and certain Aboard signs. KCC 17.445.090. The sign code prohibits offsite signs, providing that "[b]illboards and signs not directing attention to products or services available on the premises where the sign is situated are prohibited." KCC 17.445.070(C).
Mattress Outlet argues that its raincoats are not signs under the ordinance. Mattress Outlet contends that the raincoats are apparel, and apparel is not regulated by the ordinance. Mattress Outlet points out that the ordinance's examples of portable signs are fixtures to land, such as an A-frame or a pole. Mattress Outlet argues that the ordinance does not speak to something worn by a person. Kitsap County, on the other hand, argues that the raincoats worn by Mattress Outlet workers are not ordinary clothing and "are nothing more than a sandwich board sign," which falls within the nonexclusive list of portable signs such as A-frame and reader board signs. Br. of Resp't at 13-14.
Mattress Outlet's raincoats are not ordinary raincoats. The raincoats display the name, phone number, and address of Mattress Outlet in large letters and also state, "1/2 PRICE MATTRESS SALE." The parties agree that the raincoats display a collection of letters and numbers, as referenced in the ordinance's definition of a sign. Unlike ordinary raincoats, these coats are reinforced to make them rigid and flat for the purpose of making the message more readable. The wearer appears to be encased in a large, rectangular structure rather than to be wearing a piece of clothing.
The wearers are paid contractors hired for the sole purpose of displaying the Mattress Outlet advertising message. The parties agree that the raincoats are intended "to call attention to" the Mattress Outlet store, as stated in the ordinance's definition of a "sign." KCC 17.110.675. The Mattress Outlet raincoats are worn in all types of weather; their purpose is unrelated to the purpose of ordinary apparel. Therefore, the raincoats fit within the definition of a sign.
In addition, the raincoats reasonably fall within the definition of a portable sign, which includes A-frame and reader board signs. Even if the raincoats did not fall within the specific classifications of A-frames and reader board signs, the list of portable signs in the code is expressly nonexclusive. The raincoat is designed to function as a retail sign, and mounting the advertising message on the raincoat rather than cardboard or *1284 other material does not obscure the raincoat's character as a sign. Therefore, we hold that the Mattress Outlet raincoats are signs subject to the Kitsap County sign ordinance.
We now turn to the question of whether KCC 17.445.070(C) is an unconstitutional restriction of commercial speech as applied to Mattress Outlet. The First Amendment to the federal constitution (applied to the states through the Fourteenth Amendment) provides that "[c]ongress shall make no law ... abridging the freedom of speech." U.S. Const. amend. I. Our state constitution protects freedom of speech, guaranteeing that "[e]very person may freely speak, write and publish on all subjects, being responsible for the abuse of that right." Const., art. I § 5.[1]
Commercial speech "propose[s] a commercial transaction." United States. v. Edge Broad. Co., 509 U.S. 418, 426, 113 S.Ct. 2696, 125 L.Ed.2d 345 (1993). It is "expression related solely to the economic interests of the speaker and its audience." Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n, 447 U.S. 557, 561, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980). The constitution allows greater governmental regulation of commercial speech because commercial speech has a great potential to mislead and because the state has an interest in protecting the public from those seeking to obtain the public's money. Rubin v. Coors Brewing Co., 514 U.S. 476, 495, 115 S.Ct. 1585, 131 L.Ed.2d 532 (1995); Nat'l Fed'n of Retired Persons v. Ins. Comm'r, 120 Wash.2d 101, 114, 838 P.2d 680 (1992).
On the other hand, society has a strong interest in preserving the free flow of commercial information. Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc., 425 U.S. 748, 763, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976). As the Court has stated, a "`particular consumer's interest in the free flow of commercial information ... may be as keen, if not keener by far, than his interest in the day's most urgent political debate.'" Coors Brewing, 514 U.S. at 481-82, 115 S.Ct. 1585 (quoting Va. State Bd. of Pharmacy, 425 U.S. at 763, 96 S.Ct. 1817). The "general rule is that the speaker and the audience, not the government, assess the value of the information presented." Edenfield v. Fane, 507 U.S. 761, 767, 113 S.Ct. 1792, 123 L.Ed.2d 543 (1993).
A four-part test determines whether commercial speech restrictions are permissible. Cent. Hudson, 447 U.S. at 557, 100 S.Ct. 2343. The Central Hudson test asks (1) whether the speech concerns a lawful activity and is not misleading, (2) whether the government's interest is substantial, (3) whether the restriction directly and materially serves the asserted interest, and (4) whether the restriction is no more extensive than necessary. The party seeking to uphold a restriction on commercial speech carries the burden of justifying it. Thompson v. W. States Med. Ctr., 535 U.S. 357, 122 S.Ct. 1497, 152 L.Ed.2d 563 (2002); Ino Ino, 132 Wash.2d at 114, 937 P.2d 154.
In this case, the first two prongs are undisputed. The parties agree that the first prong is satisfied because the mattress sales are lawful and the advertisement is not misleading. They also agree that the second prong is satisfied because the government has a substantial interest in traffic safety and aesthetics. Metromedia, Inc. v. City of San Diego, 453 U.S. 490, 507-08, 101 S.Ct. 2882, 69 L.Ed.2d 800 (1981).
The parties disagree as to the third and fourth prongs of the Central Hudson test. These prongs involve a consideration of the "fit" between the legislature's ends and the means chosen to accomplish those ends. Edge, 509 U.S. at 427-28, 113 S.Ct. 2696 (quoting Posadas de Puerto Rico Assocs. v. Tourism Co. of P. R., 478 U.S. 328, 341, 106 S.Ct. 2968, 92 L.Ed.2d 266 (1986)).
*1285 The third prong of the Central Hudson test requires Kitsap County to show that the ordinance directly and materially serves the governmental interests. Edenfield, 507 U.S. at 767, 113 S.Ct. 1792. The burden is not satisfied by" `mere speculation and conjecture; rather, a governmental body seeking to sustain a restriction on commercial speech must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree.'" Lorillard Tobacco Co. v. Reilly, 533 U.S. 525, 555, 121 S.Ct. 2404, 150 L.Ed.2d 532 (2001) (quoting Greater New Orleans Broad. Ass'n. v. U.S, 527 U.S. 173, 188, 119 S.Ct. 1923, 144 L.Ed.2d 161 (1999)).
Mattress Outlet contends this case is similar to City of Cincinnati v. Discovery Network, Inc., 507 U.S. 410, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993), in which the Supreme Court struck down a municipal regulation as an unconstitutional restriction of commercial speech. Discovery Network published a free magazine advertising adult programs, which was dispensed from free standing news racks placed on city sidewalks. The city ordered Discovery Network to remove its news racks pursuant to an ordinance prohibiting distribution of commercial handbills on the public right of way. Discovery Network, 507 U.S. at 415, 113 S.Ct. 1505. The city stated that the goal of the regulation was to ensure safe streets and regulate visual blight.
The Supreme Court held that the prohibition of commercial news racks failed the third and fourth prongs of the Central Hudson test. The Court noted that of the approximately 1,500 to 2,000 news racks in the city, only 62 were commercial racks prohibited by the regulation. Therefore, the regulation would have only a minimal effect on safety and aesthetics. While the Court agreed with the city's argument that an incremental decrease in news racks provides an incremental increase in aesthetics and safety, that "paltry" benefit was not material enough to justify the restriction of Discovery Network's First Amendment rights. A minimal benefit will not support a restriction of free speech. Discovery Network, 507 U.S. at 418, 113 S.Ct. 1505.
The Court also held that the regulation was not a reasonable means of achieving its stated goals of safety and aesthetics. The commercial news racks were no more harmful than the noncommercial news racks. The Court cautioned against placing too much importance on the distinction between commercial and noncommercial speech, especially where the distinction bears no relationship to the particular interests asserted by the city. Discovery Network, 507 U.S. at 424, 113 S.Ct. 1505. Because commercial and noncommercial news racks were equally offensive and dangerous, the commercial/noncommercial distinction was an impermissible basis upon which to regulate the news racks.
Here, as in Discovery Network, prohibiting persons from wearing signage provides minimal, if any, benefit in aesthetics and safety. There is no evidence that the Mattress Outlet signs have any effect on traffic safety. Mere speculation of harm will not justify a limitation on the exercise of the right of free speech. Consol. Edison Co. of N.Y., Inc. v. Pub. Serv. Comm'n of N.Y., 447 U.S. 530, 100 S.Ct. 2326, 65 L.Ed.2d 319 (1980). As to the goal of aesthetics, the raincoat-clad workers are not the type of signage generally thought of as contributing to visual blight. Accordingly, the county has failed to affirmatively establish that its restriction materially and directly advances its interests in aesthetics and safety.
Likewise, we hold that the Kitsap County ordinance fails to meet the fourth prong of the Central Hudson test. Under the fourth prong, we examine the means chosen to accomplish the government's asserted interest. Discovery Network, 507 U.S. at 416, 113 S.Ct. 1505. The county bears the burden of establishing that the restrictions are no more extensive than necessary to serve the county's stated interests. Cent. Hudson, 447 U.S. at 566, 100 S.Ct. 2343. The restriction must be narrowly tailored. Bd. of Trs. v. Fox, 492 U.S. 469, 480, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989). While the means chosen need not be the least restrictive means, the fit between the *1286 means chosen and the interests asserted must be reasonable. Coors Brewing, 514 U.S. at 491, 115 S.Ct. 1585. The existence of numerous and obvious less-burdensome alternatives to the restriction on commercial speech is relevant in reviewing the reasonability of the means chosen. Discovery Network, 507 U.S. at 416 n. 12, 113 S.Ct. 1505.
Here, as in Discovery Network, the Kitsap County ordinance distinguishes between commercial and noncommercial speech, although that distinction does not bear any relationship to the county's interests in aesthetics and safety. Discovery Network, 507 U.S. at 424, 113 S.Ct. 1505. As in Discovery Network, the offsite signs prohibited by the Kitsap County ordinance are no more hazardous to traffic and no more aesthetically offensive than many of the signs exempted from the ordinance, such as farm produce signs, yard sale signs, and special event signs for holiday bazaars.
The Kitsap County sign ordinance reaches farther than necessary to achieve goals of aesthetics and safety. The total ban of offsite advertising under KCC 17.445.070(C) does not reflect any method of narrowly tailoring the restriction to meet the specific goals of increased safety and aesthetics. For example, if traffic safety is a concern, then the county can designate restrictions as to place and time, without completely prohibiting this method of advertising. At a minimum, the county restrictions could be narrowly tailored so as to accommodate the reasonable use of apparel displays. As it is, the offsite advertising ban burdens substantially more speech than is necessary to further the government's interests.
The county has failed to demonstrate that a total ban of offsite advertising is a reasonable method of achieving its goals. Therefore, we hold that KCC 17.445.070(C) fails the fourth prong of the Central Hudson test.[2]
Accordingly, we hold that KCC 17.445.070(C) of the Kitsap County sign ordinance is an unconstitutional restriction of free speech as applied to the commercial speech of Mattress Outlet. The decision of the superior court is reversed. The citations against Mattress Outlet were properly dismissed by the district court.
SANDERS, CHAMBERS and OWENS, JJ., concur.
ALEXANDER, C.J. (concurring in result).
I concur in the result the majority reaches. I write separately simply to express my view that it is unnecessary for us to reach the constitutional issue that the majority and dissent discuss at length. I reach this conclusion because it is apparent from the record that Mattress Outlet's raincoats do not fall within the definition of a "portable sign." Such a sign is defined in Kitsap County's ordinance as one "which has no permanent attachment to a building or the ground which include[s], but is not limited to, A-frame, pole attachment, banners and reader board signs." Kitsap County Code (KCC) 17.110.620. While I readily concede that the raincoats in question are not permanently attached to any building or the ground, they do not resemble any of the specific items listed in the ordinance. This is significant because there is a well known canon of construction known as "ejusdem generis," which provides that when a general term is in sequence with specific terms, the general term is restricted to items similar to the specific terms.
While one could posit that I am engaging too narrow a reading of Kitsap County's sign ordinance, I would respond that the majority's broad interpretation of the term "portable sign" is problematic. This is so because it is common today to see persons wearing all manner of clothing that conspicuously contains the name or trademark of the manufacturer or that of another business enterprise such as a sporting enterprise  a NASCAR[1] *1287 driver's uniform comes readily to mind. While this type of clothing may impart a more subtle commercial message than do Mattress Outlet's raincoats, the effect is the same and that is to call "attention to a business, product, activity, person or service." KCC 17.110.675. I believe that we can reasonably assume from the wording of the Kitsap County ordinance that it was not intended to sweep within its reach so much commonly worn apparel.
In sum, because the Mattress Outlet raincoats are not signs under the ordinance in question, the wearing of them is not unlawful.
CHAMBERS, J. (concurring).
I concur. I write separately because I conclude the Kitsap County ordinance is also unconstitutionally vague.
When an ordinance implicates free speech rights, we give it special attention. City of Bremerton v. Spears, 134 Wash.2d 141, 159, 949 P.2d 347 (1998) (citing City of Spokane v. Douglass, 115 Wash.2d 171, 182, 795 P.2d 693 (1990)); cf. Bd. of Trs. v. Fox, 492 U.S. 469, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989) (examining when statutes aimed at regulating commercial free speech may be challenged as overbroad). Our state and federal constitutions require that government write laws that the people can understand and that provide ascertainable standards to guide the enforcement of the law. State v. Williams, 144 Wash.2d 197, 203, 26 P.3d 890 (2001); State v. Halstien, 122 Wash.2d 109, 117, 857 P.2d 270 (1993). Vaguely worded ordinances do not meet this constitutional requirement. Still, even when free speech principles are implicated, scientific precision is not required. As long as persons of common intelligence can reasonably determine the meaning and applicability of the statute, the statute is not vague. Douglass, 115 Wash.2d at 178, 795 P.2d 693; Halstien, 122 Wash.2d at 118, 857 P.2d 270.
In this case, the ordinance defines a sign as "a collection of letters, numbers or symbols which calls attention to a business, product ... or service." Kitsap County Code (KCC) § 17.110.675. A portable sign is defined broadly as one "which has no permanent attachment to a building or the ground." KCC § 17.110.620. Arguably, my mother's ball cap, sweat shirt, and windbreaker are all portable signs. Her shopping bag, boldly advertising the name of her favorite department store, is even more suspect. She would be well advised not to window shop in Kitsap County.
The line between innocent and unlawful conduct should be clear. But these definitions are so broad that a person of average intelligence can only guess when they must get a permit before they may lawfully wear a particular hat, shirt, or rain coat in Kitsap County. Accord City of Bellevue v. Lorang, 140 Wash.2d 19, 21, 30-31, 992 P.2d 496 (2000) (striking ordinance as vague when it prohibited telephone calls "`without purpose of legitimate communication'"); Williams, 144 Wash.2d at 203, 26 P.3d 890 (holding ordinance that prohibited harassment that caused harm to the mental health of the victim was unconstitutional vague).
Additionally, this lack of clarity delegates far too much authority to those charged with enforcement. Cf. Halstien, 122 Wash.2d at 117, 857 P.2d 270. Under the ordinance as written, my mother might be prohibited from window shopping in Kitsap County or might not be. It does not provide sufficient guidance to local peace officers. Accordingly, I conclude that this ordinance is unconstitutionally vague. I respectfully concur.
MADSEN, J. (dissenting).
Using a flawed analysis leads the majority to conclude that Kitsap County's sign ordinance as applied to Mattress Outlet's raincoat-sign advertisements violates the First Amendment. Although the majority recognizes that the applicable test is the four-part test of Central Hudson, unfortunately the majority confuses the third and fourth prongs of that test. Cent. Hudson Gas & *1288 Elec. Corp. v. Pub. Serv. Comm' n, 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980). The majority's conclusion is also directly at odds with the analysis in Metromedia, Inc. v. City of San Diego, 453 U.S. 490, 101 S.Ct. 2882, 69 L.Ed.2d 800 (1981). Metromedia, along with other cases, recognizes that regulation of offsite advertising aimed at passing motorists directly advances substantial governmental interests in both traffic safety and aesthetics, thus satisfying the third prong of the Central Hudson test. Finally, the majority misreads and thus misapplies City of Cincinnati v. Discovery Network, Inc., 507 U.S. 410, 113 S.Ct. 1505, 123 L.Ed.2d 99 l. Ed.2d 99 (1993) to conclude that the ordinance is not sufficiently tailored to satisfy the fourth prong of the Central Hudson test. I would hold that the Kitsap County ordinance is constitutional as applied to Mattress Outlet's raincoat signs. Accordingly, I dissent.

ANALYSIS
In order to advertise its business, Mattress Outlet pays people to stand on street corners and wave at passing motorists while wearing sandwich-board "raincoats" that display Mattress Outlet's advertising. Kitsap County Code (KCC) 17.445.070(C) prohibits the use of offsite billboards and signs such as the Mattress Outlet raincoats.
As the majority recognizes, Central Hudson provides the appropriate analysis for deciding whether the ordinance unconstitutionally restricts commercial speech.[1] The parties agree that only the third and fourth prongs of the Central Hudson test are at issue, i.e., whether the ordinance directly advances a substantial government interest and, if so, whether its restriction is no more extensive than necessary. See Cent. Hudson, 447 U.S. at 566, 100 S.Ct. 2343.[2] The majority concludes that neither prong is satisfied as to either of the governmental interests claimed, traffic safety, and aesthetics. Turning first to the third prong, the majority asserts that the effect of the raincoat signs on traffic safety is "mere speculation." Majority at 1290, 1292. This assertion is contradicted by Metromedia, which established that the First Amendment does not prevent local governments from prohibiting offsite commercial billboards in the interests of traffic safety and aesthetics.[3]
In Metromedia, 453 U.S. 490, 101 S.Ct. 2882, 69 L.Ed.2d 800, the United States Supreme Court dealt with a San Diego ordinance that allowed on-premises advertising but prohibited off-premises advertising, subject to certain exceptions. The same governmental interests asserted here were advanced by the city of San Diego. The Court applied the Central Hudson test, beginning with the observation that it "is far too late" to contend that either traffic safety or aesthetics is not a substantial governmental goal. Metromedia, 453 U.S. at 507-08, 101 S.Ct. 2882. In addressing the third prong of the *1289 test, the Court accepted the local lawmakers' determination that advertising designed to divert a driver's attention from the roadway is a real and substantial risk to safety:
We ... hesitate to disagree with the accumulated, commonsense judgments of local lawmakers and of the many reviewing courts that billboards are real and substantial hazards to traffic safety. There is nothing here to suggest that these judgments are unreasonable. As we said in a different context:
We would be trespassing on one of the most intensely local and specialized of all municipal problems if we held that this regulation had no relation to the traffic problem of New York City. It is the judgment of the local authorities that it does have such a relation. And nothing has been advanced which shows that to be palpably false.
Metromedia, 453 U.S. at 509, 101 S.Ct. 2882 (quoting Ry. Express Agency, Inc. v. New York, 336 U.S. 106, 109, 69 S.Ct. 463, 93 L.Ed. 533 (1949)). The Court held that as a matter of law an ordinance prohibiting advertising designed to be viewed from the street relates to traffic safety. Metromedia, 453 U.S, at 508-09, 101 S.Ct. 2882 (adopting the reasoning in the lower court decision, Metromedia v. City of San Diego, 26 Cal.3d 848, 164 Cal.Rptr. 510, 610 P.2d 407 (1980)). In fact, the Court expressly stated that "the prohibition of offsite advertising is directly related to the stated objectives of traffic safety and aesthetics." Metromedia, 453 U.S. at 511, 101 S.Ct. 2882.
Citing Metromedia, the Ninth Circuit similarly held in a case involving a Seattle billboard ordinance that "[a]s a matter of law Seattle's ordinance, enacted to further the city's interest in aesthetics and safety, is a constitutional restriction on commercial speech without detailed proof that the billboard regulation will in fact advance the city's interests." Ackerley Communications of N.W., Inc. v. Krochalis, 108 F.3d 1095, 1099-1100 (9th Cir.1997) (emphasis added). And this court similarly has acknowledged a direct relationship between regulation of outdoor advertising messages and traffic safety. Markham Adver. Co. v. State, 73 Wash.2d 405, 421, 439 P.2d 248 (1968). Because, as a matter of law, restricting the use of billboards and signs directly advances a substantial government interest in traffic safety, this court should hold that the ordinance at issue here satisfies the third prong of the Central Hudson test.
However, instead of a straightforward application of the Central Hudson test, the majority relies on Discovery Network for what it believes is a "minimal benefit" approach. The majority proposes that the "minimal benefit" of "prohibiting persons from wearing signage" is a reason why the ordinance fails to directly advance the county's interest in traffic safety. Majority at 1291-1292. However, this reasoning both misapplies Discovery Network and mistakenly incorporates the fourth prong of Central Hudson into the third prong.
Discovery Network did not concern the third prong of the Central Hudson test. Instead, the Court analyzed the degree of benefit resulting from the ordinance at issue when deciding whether its restriction was more extensive than necessary, i.e., the fourth prong of Central Hudson. Discovery Network, 507 U.S. at 416 n. 12, 417, 428, 113 S.Ct. 1505. In Discovery Network, the Court found unconstitutional a city of Cincinnati ordinance prohibiting the distribution of commercial handbills on public property, under which the city ordered removal of "commercial" newsracks but not racks containing newspapers. The fatal flaw in the ordinance at issue in Discovery Network was not that it failed to advance a legitimate interest, but rather that it did so in an impermissible manner. Application of the ordinance led to removal of only 62 newsracks while about 1,500-2,000 remained in place. This benefit, the Court agreed, was "minute" and "paltry." Discovery Network, 507 U.S. at 417-18, 113 S.Ct. 1505. The Court also determined that the categorical ban on commercial newsracks placed too much importance on a distinction between commercial speech and noncommercial *1290 speech, given that much of the content of ordinary newspapers is commercial speech. The distinction, the Court said, bore "no relationship whatsoever" to Cincinnati's interests in safety and aesthetics. Discovery Network, 507 U.S. at 423, 424, 113 S.Ct. 1505. As the dissent in Discovery Network noted, "[a]lthough the Court does not say so, there can be no question that Cincinnati's prohibition against respondents' newsracks `directly advances' its safety and esthetic interests because, if enforced, the city's policy will decrease the number of newsracks on its street corners." Discovery Network, 507 U.S. at 440, 113 S.Ct. 1505 (Rehnquist, J., dissenting). The Court did not suggest that the degree of benefit is relevant to the third prong of the Central Hudson test.
In this case, the ordinance at issue directly reduces the number of signs at street corners that may distract motorists. Thus, there is no question that it advances the interest in traffic safety. In short, regardless of the degree of benefit, the ordinance directly advances the county's legitimate interest in traffic safety.
The majority also relies on Edenfield v. Fane, 507 U.S. 761, 113 S.Ct. 1792, 123 L.Ed.2d 543 (1993) and Lorillard Tobacco Co. v. Reilly, 533 U.S. 525, 121 S.Ct. 2404, 150 L.Ed.2d 532 (2001) for the proposition that for this court to sustain the restriction on offsite advertising, Kitsap County must demonstrate that the harms the ordinance addresses are real and materially alleviated by the restriction. Majority at 1290. While the majority quotes this standard from Lorillard, it instills in it a stricter meaning than the United States Supreme Court did. Significantly, the Court also said in Lorillard:
We do not, however, require that "empirical data come ... accompanied by a surfeit of background information.... [W]e have permitted litigants to justify speech restrictions by reference to studies and anecdotes pertaining to different locales altogether, or even, in a case applying strict scrutiny, to justify restrictions based solely on history, consensus, and `simple common sense.'"
Lorillard, 533 U.S. at 555, 121 S.Ct. 2404 (quoting Fla. Bar v. Went For It, Inc., 515 U.S. 618, 628, 115 S.Ct. 2371, 132 L.Ed.2d 541 (1995)). Thus, Lorillard confirms that consensus and common sense can be significant factors in assessing whether harms are real and a given restriction will alleviate them, or, conversely, that the restriction will not alleviate the harms. For example, the Court found in Lorillard that a ban of in-store tobacco advertising below five feet did not advance the State's interest in preventing minors from using tobacco on the commonsense grounds that some children are over five feet tall and others may look up (and thus could still view advertisers' messages). Lorillard, 533 U.S. at 566, 121 S.Ct. 2404. Edenfield is distinguishable because there the Court found that a rule prohibiting direct solicitation by certified public accountants did not directly advance the governmental interest asserted because two studies expressly contradicted the Board of Accountancy's contention that personal solicitation by certified public accountants creates a danger of fraud, overreaching, or compromised independence. Edenfield, 507 U.S. at 771-72, 113 S.Ct. 1792.
Much more importantly, neither Lorillard nor Edenfield contradicts Metromedia's conclusion that "the prohibition of offsite advertising is directly related to the stated objectives of traffic safety and aesthetics." Metromedia, 453 U.S. at 511, 101 S.Ct. 2882.
In Central Hudson itself, the Court found the asserted governmental interest in energy conservation was advanced by an order requiring electric utilities in New York State to cease all advertising that promoted the use of electricity. The Court held that the order directly and materially served the legitimate government interest in energy conservation, acknowledging "an immediate connection between advertising and demand for electricity." Central Hudson, 447 U.S. at 569, 100 S.Ct. 2343. Indeed, the Court reasoned that appellant Central Hudson "would not contest the advertising ban unless it believed that promotion would increase its sales." Id. The *1291 Court did not consider, nor require, empirical evidence to satisfy the third Central Hudson prong.
Here, Mattress Outlet would not use its raincoat-signs to advertise if the signs did not, as Mattress Outlet admits, call drivers' attention away from the roadway. Because the ordinance at issue here removes raincoat-signs from sidewalks adjacent to passing motorists, an immediate connection exists between that regulation and the county's interest in traffic safety. On the basis of the county's substantial interest in traffic safety alone, the ordinance satisfies the third prong of the Central Hudson test.
The majority next dismisses Kitsap County's interest in aesthetics as a justification for its ordinance without citing a single case in support of its conclusion. Majority at 1292. The majority says that the signs are only in place temporarily and are not of a type usually thought of when aesthetics are considered. Majority at 1292. Again the majority fails to recognize that Metromedia is directly to the contrary, as are other decisions by the United States Supreme Court, the Ninth Circuit, and this court.
In Metromedia, the Court concluded that a local government's interest in avoiding visual clutter is sufficient to justify a prohibition of billboards and signs. Metromedia, 453 U.S. at 507-08, 510, 101 S.Ct. 2882. The Court made the same observation in Members of City Council v. Taxpayers for Vincent, 466 U.S. 789, 806-07, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984) (expressly reaffirming the majority in Metromedia). The Ninth Circuit also recognizes that a substantial interest in aesthetics can justify a ban on billboards. Krochalis, 108 F.3d at 1099. This court likewise recognizes aesthetic values as an independent basis for regulating outdoor advertising. Markham, 73 Wash.2d at 421, 439 P.2d 248.
The majority also provides no support for its conclusion that raincoat-signs are not the type of signs that contribute to visual blight. To the contrary, large, yellow, portable raincoat-signs lie wholly within the scope of signage considered to be visual blight. Billboards visible from streets and highways contribute to visual blight. Metromedia, 453 U.S. at 510, 101 S.Ct. 2882. Signs measuring 15 by 44 inches posted on utility poles are visual blight. Vincent, 466 U.S. at 792, 810, 104 S.Ct. 2118. Signs posted by homeowners in their yards contribute to visual clutter. City of Ladue v. Gilleo, 512 U.S. 43, 54, 114 S.Ct. 2038, 129 L.Ed.2d 36 (1994) (striking the city ordinance on other grounds). Federal and state courts have specifically identified portable signs as contributing to visual blight. E.g., Lindsay v. San Antonio, 821 F.2d 1103, 1109 (5th Cir.1987); Harnish v. Manatee County, 783 F.2d 1535, 1540 (11th Cir.1986) (superseded on other grounds by federal rule of civil procedure); Barber v. Mun. of Anchorage, 776 P.2d 1035, 1038 (Alaska 1989). Mattress Outlet's raincoat-signs, like numerous other forms of visual clutter, contribute to visual blight. By prohibiting the use of the raincoat-signs as offsite commercial advertising, the ordinance directly advances Kitsap County's substantial interest in alleviating visual blight. The ordinance thus also satisfies the third prong of the Central Hudson test on the basis of esthetic interests.
Contrary to the majority, I would apply well-established case law and in doing so conclude that the ordinance meets the third prong of Central Hudson.
The Kitsap County ordinance is also sufficiently tailored to meet the fourth prong of the Central Hudson test. See Board of Trs. v. Fox, 492 U.S. 469, 476-81, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989); United States v. Edge Broad. Co., 509 U.S. 418, 429, 113 S.Ct. 2696, 125 L.Ed.2d 345 (1993). As to this prong, Mattress Outlet's challenge succeeds only if it establishes that its raincoat-signs fall outside the confines of a properly drawn prohibition. See Fox, 492 U.S. at 482, 109 S.Ct. 3028 ("[t]he person invoking the commercial-speech narrow-tailoring rule asserts that the acts of his that are the subject of the litigation fall outside what a properly drawn prohibition could cover" (emphasis omitted)). As the majority states, the ordinance *1292 is not tested facially, but as applied to Mattress Outlet's particular form of commercial speech. Fox, 492 U.S. at 482, 109 S.Ct. 3028; see majority at 1286. The question before this court is therefore properly framed as whether Mattress Outlet's use of raincoat-signs as offsite advertising may be prohibited in the interests of traffic safety and aesthetics. The majority erroneously views the issue as whether the ordinance "could be narrowly tailored so as to accommodate the reasonable use of apparel displays." Majority at 1292. Like the use of commercial billboards in Metromedia and political posters in Vincent, Mattress Outlet's use of raincoat-signs may be prohibited to promote traffic safety and aesthetics.
Central Hudson's fourth prong requires a "reasonable fit" between a regulatory prohibition and the interests that it serves. Discovery Network, 507 U.S. at 416, 113 S.Ct. 1505. A reasonable fit is "not necessarily [a] perfect" fit, "but one whose scope is `in proportion to the interest served,'... not necessarily the least restrictive means but ... narrowly tailored." Fox, 492 U.S. at 480, 109 S.Ct. 3028 (quoting In re R.M.J., 455 U.S. 191, 203, 102 S.Ct. 929, 71 L.Ed.2d 64 (1982)). As such, "almost all of the restrictions disallowed under Central Hudson's fourth prong have been substantially excessive, disregarding `far less restrictive and more precise means.'" Fox, 492 U.S. at 479, 109 S.Ct. 3028 (quoting Shapero v. Kentucky Bar Ass'n, 486 U.S. 466, 476, 108 S.Ct. 1916, 100 L.Ed.2d 475 (1988)).
The majority mistakenly believes that Discovery Network is analogous and that under Discovery Network Kitsap County's ordinance is unconstitutional under the fourth prong of the Central Hudson test. Majority at 1292. However, the majority fails to heed the cautionary words of the Court in Discovery Network when it distinguished Metromedia. The Court said that unlike the ordinance at issue in Metromedia, the ordinance in Discovery Network was applied in a way that unjustifiably discriminated between commercial and noncommercial speech. Discovery Network, 507 U.S. at 425 n. 20, 113 S.Ct. 1505. The city of Cincinnati sought to ban newsracks used to distribute commercial handbills comprised mostly of advertising, while at the same time it allowed identical newsracks used to distribute ordinary newspapers containing up to 70 percent advertising. Discovery Network, 507 U.S. at 419-20, 420 n. 16, 113 S.Ct. 1505. The ordinance failed because, without any legitimate basis for doing so, it discriminated against newsracks that were no more harmful than those permitted. Discovery Network, 507 U.S. at 418, 113 S.Ct. 1505. The Court in Discovery Network accordingly found the distinction between commercial handbills and ordinary newspapers unjustified. Discovery Network, 507 U.S. at 419-20, 113 S.Ct. 1505. In contrast, the ordinance at issue here does not make such a distinction; it simply prohibits offsite billboards and signs.[4] KCC 17.445.070(c). Restated, unlike the city in Discovery Network, Kitsap County has not attempted to distinguish "low value" commercial speech for purposes of a selective ban or to permit signs that are as disruptive of traffic as those prohibited. The analogy drawn by the majority is thus inaccurate and inappropriate. Government regulations may distinguish between different categories of commercial speech. Discovery Network, 507 *1293 U.S. at 425 n. 20, 113 S.Ct. 1505. Discovery Network provides no basis here for finding a First Amendment violation.[5]
The majority also erroneously reasons that the Kitsap County ordinance fails the Central Hudson test because, the majority says, the ordinance "burdens substantially more speech than is necessary." Majority at 1293. That, however, is not the narrow tailoring test defined in Central Hudson. The Central Hudson test as explained in Fox merely looks for a reasonable fit between an ordinance's prohibition of commercial speech and the government interest served. Fox, 492 U.S. at 480, 109 S.Ct. 3028. The Court in Discovery Network, for example, found a poor fit between the ordinance in question and the city's interest in aesthetics because the ordinance was applied in a discriminatory fashion to remove only 62 of 1,500 unsightly newsracks. Discovery Network, 507 U.S. at 417-18, 113 S.Ct. 1505. The Court determined that the ordinance as applied bore "no relationship whatsoever" to the city's interest in safety and aesthetics and thus was "an impermissible means of responding to the city's admittedly legitimate interests." Discovery Network, 507 U.S. at 423, 424, 113 S.Ct. 1505. Discovery Network did not establish a rule against removing all newsracks from sidewalks. Discovery Network, 507 U.S. 427-28, 113 S.Ct. 1505. In suggesting as much, the majority conflates the Central Hudson test with overbreadth and vagueness challenges which Mattress Outlet cannot sustain. [6] While Mattress Outlet has speculated about the possibility that the ordinance might be applied to prohibit normal apparel, the hypothetical case of a pedestrian cited for wearing a shirt with a company's name or logo is not before this court. Further, unlike the plaintiffs in Fox, Mattress Outlet may not claim infringement of noncommercial speech interests. See Fox 492 U.S. at 482-84, 109 S.Ct. 3028. As the majority says, Mattress Outlet's raincoat-signs fall squarely within the scope of the Kitsap County ordinance. Majority at 1289-90. Ordinances like KCC 17.445.070(C) which prohibit offsite commercial advertising are consistently upheld as constitutional. See Metromedia, 453 U.S. at 512, 101 S.Ct. 2882; Vincent, 466 U.S. at 806-07, 104 S.Ct. 2118 (affirming Metromedia); Outdoor Sys., Inc. v. City of Mesa, 997 F.2d 604 (9th Cir.1993); Krochalis, 108 F.3d at 1099; Nat'l Adver. Co. v. City of Orange, 861 F.2d 246 (9th Cir.1988) (invalidating ordinance on other grounds only as to noncommercial speech); cf. Markham Adver. Co. v. State, 73 Wash.2d 405, 439 P.2d 248 (1968). As applied to Mattress Outlet's use of offsite raincoat signs to direct commercial messages to passing motorists, the Kitsap County ordinance is a valid prohibition that should be upheld.
JOHNSON, FAIRHURST and Bridge, JJ., concur.
NOTES
[*] Justice Faith Ireland is serving as a justice pro tempore of the Supreme Court pursuant to Const. art. IV, § 2(a).
[1] Although our state constitution may be more protective of free speech than the federal constitution, it is unnecessary to consider a state constitutional analysis because KCC 17.445.070(C) fails the minimum protection provided under the federal constitution.
[2] Because of our holding, it is unnecessary to decide Mattress Outlet's arguments that the ordinance is unconstitutionally overbroad and vague.
[1] National Association for Stock Car Auto Racing.
[1] Mattress Outlet maintains that the Washington State Constitution provides more protection for its advertising than the First Amendment but makes this claim with respect to an unavailing overbreadth challenge. In connection with the kind of constitutional inquiry addressed here, this court has determined that the analysis for assessing the constitutionality of restrictions on commercial speech is the same under the state constitution as under the First Amendment. Ino Ino, Inc. v. Bellevue, 132 Wn.2d 103, 116, 937 P.2d 154; 943 P.2d 1358 (1997); Nat'l Fed'n of Retired Persons v. Ins. Comm'r, 120 Wash.2d 101, 119, 838 P.2d 680 (1992).
[2] The speech in question, Mattress Outlet's advertising raincoat-signs, concerns a lawful activity and is not misleading, thus satisfying the first prong of the Central Hudson test, and the government has a substantial interest in traffic safety and aesthetics, thus satisfying the second prong. See Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n, 447 U.S. 557, 566, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980).
[3] There are several opinions in Metromedia, Inc. v. City of San Diego, 453 U.S. 490, 101 S.Ct. 2882, 69 L.Ed.2d 800 (1981). All of my references to Metromedia will be to that part of the four-member plurality opinion joined by Justice Stevens, thus comprising a decision of the majority of the Court. See Metromedia, 453 U.S. at 541, 101 S.Ct. 2882 (Stevens, J., dissenting in part, joining parts I through IV of the lead opinion). I note that other members of the Court also agreed with relevant parts of the plurality in separate opinions, although I do not specifically cite all of the opinions on each point.
[4] Notably, the Kitsap County ordinance is very much like other ordinances found to apply only to commercial speech. The Kitsap County Code regulates signs that "call [ ] attention to a business, product, activity, person, or service." KCC 17.110.675. The municipal ordinance at issue in Suffolk v. Hulse prohibited offsite signs which direct [ ] attention to a business, community, service, entertainment, or attraction. Suffolk Ourdoor Adver. Co. v. Hulse, 43 N.Y.2d 483, 402 N.Y.S.2d 368, 373 N.E.2d 263 (1977), cited in Metromedia, 453 U.S. at 499, 101 S.Ct. 2882. Moreover, the conditionally exempted temporary signs noted by the majority may be distinguished from Mattress Outlet's raincoat-signs. Farm produce and holiday bazaar sandwich board signs must be onsite; other holiday bazaar signs require a permit; yard sale signs are limited to four square feet, making them much smaller than Mattress Outlet's raincoat-signs. KCC 17.445.090. Additionally, these signs are likely to be temporary or seasonal.
[5] It is also interesting to note that even as to distinguishing between commercial and noncommercial speech, the Court described its holding in Discovery Network as "narrow" and said that it did not reach the question whether under other facts and circumstances a community might be able to justify differential treatment of commercial and noncommercial newsracks. Discovery Network, 507 U.S. at 428, 113 S.Ct. 1505.
[6] "A successful attack upon a commercial-speech restriction on narrow-tailoring grounds ... does not assure a defense to those whose own commercial solicitation can be constitutionally proscribed." Fox, 492 U.S. at 483, 109 S.Ct. 3028 (citing Cent. Hudson, 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341; Shapero v. Kentucky Bar Assn., 486 U.S. 466, 108 S.Ct. 1916, 100 L.Ed.2d 475 (1988)); see also Fox 492 U.S. at 481, 109 S.Ct. 3028 (stating that the alleged overbreadth applied to Fox's non commercial speech).